UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| BRADLEY VAN DYKE, <br><br> Plaintiff, <br><br> v. <br><br> D.K. SISTO, et al., <br><br> Defendants. | NO. 08-cv-3120-JLQ <br><br> **ORDER GRANTING MOTION FOR SUMMARY JUDGMENT** |

BEFORE THE COURT is Defendants' Motion for Summary Judgment (ECF No. 51). For the foregoing reasons, the court finds the Defendants entitled to summary judgment.

**I.   FACTS**

Plaintiff Bradley Van Dyke is an African American inmate now in his fifties who is in the custody of the California Department of Corrections and Rehabilitations. At all times relevant to this action he was housed at California State Prison-Solano (CSP-Solano). He claims he is non-gang affiliated. California prisons have endured instances of severe race-based prison violence and have been known as "a breeding ground for some of the most violent prison gangs in America-all of them organized along racial lines." *See Johnson v. California*, 543 U.S. 499, 542 (2005)(Thomas, J. dissenting); *Beard v. Banks*, 548 U.S. 521. 536-537 (2006)(Thomas, J., concurring)(noting that two were killed and hundreds were injured in a race riot); *Noble v. Adams,* --- F.3d ----, 2011 WL 3275871 (9th Cir. 2011)(describing 2002 armed riot and mass assault on staff at Corcoran state prison). The

ORDER - 1

record demonstrates CSP-Solano is no exception. In November 2005, a riot occurred between 250 African American and Southern Hispanic inmates. ECF No. 1. In May 2006, the day when Southern Hispanic inmates were released back to normal operations ("programming"), an attack occurred on Southern Hispanic inmates by African American inmates. Two months later, on July 6, 2006, an altercation occurred on the Facility 1 yard where a group of 33 Southern Hispanic inmates assaulted and injured African-American inmates using weapons. There is no evidence Van Dyke was involved in any of these incidents.

After the July 2006 altercation, the inmates involved in the incident were placed in administrative segregation and all Southern Hispanic inmates were placed in a "lockdown" and a "modified program" for months thereafter. The declarations of the Defendants evidence that during a lockdown, the institution's routines and inmates' "regular programming" are affected, as are the institutional staffing needs and duties. According to Defendants, immediately after the incident, locked-down Southern Hispanic inmates were searched and handcuffed prior to being escorted, and there was one escort officer per inmate. During the lockdown, the affected inmates were fed in their cells and were not allowed out of their cells without an escort. All support programs, such as educational programs and prison jobs were restricted or unavailable. Prison officials investigated the event and met frequently to assess the status of the lockdown and consider whether and when a return to regular programming was feasible.

Over time, prison officials took measures to gradually loosen restrictions on the movement and activities of locked-down inmates. By September 12, 2006, Southern Hispanic inmates were fed in small groups in the dining hall, rather than cell feeding, and they were allowed to walk to meals in groups of 10-15 inmates. By September 12, 2006 they were also subject to clothed, rather than unclothed, searches before being escorted. By November 8, 2006, Southern Hispanic inmates were allowed some dayroom activity during

ORDER - 2

designated hours. By December 15, 2006, Southern Hispanic inmates were allowed yard activity during designated hours.

Prior to December 21, 2006, the gradual lifting of restrictions had still prevented all contact between Southern Hispanic and African-American inmates. Defendants state that the information officials had gathered in its investigation indicated a potential for future violence, specifically retaliation by African-American inmates. SOF 60, 69.  On December 21, 2006, after five-months of segregation of the Southern Hispanic and African-American inmates, the separation of these inmates ended when Officer Fuizzotti, an officer with less than 1 month's experience at CSP-Solano and having just graduated from the corrections academy, escorted four Southern Hispanic inmates without handcuffs to the medical clinic. Plaintiff alleges the four were gang members, though at the time of the escort Fuizzotti was not aware whether or not the inmates were gang affiliated.  As he escorted the inmates through a breezeway located on the Facility exercise  yard  back to their housing units, Fuizzotti called out "Escort!" SOF 101. The African-American inmates present, including Van Dyke, stepped off the walkway and positioned themselves against the housing unit's north wall. Fuizzotti then announced on the radio, "Building 6, one inmate at your door." 103. The four Southern Hispanic inmates then left the escort and attacked the African-American inmates on the north wall, including Van Dyke. Officer Fuizzotti announced over the radio, "Code one, yard one," then told the inmates who were fighting to get down. They continued to fight, beating and kicking Van Dyke in the head. Fuizzotti used his pepper spray on the inmates. Responding officers arrived and fired two shots from a 40 mm multi-launcher baton. At that point, inmates responded to the orders to get down, and the fighting was ended.  Van Dyke had been kicked in the head by the attackers causing him abrasions, a loose tooth that had to be puled, swollen eyes, and a detached retina, which eventually required four surgeries and has resulted in vision loss in his right eye. He was also hit in the back by one of the multi-launcher baton shots, which took a patch of skin off his back. Van

ORDER - 3

Dyke did not know the four inmates who committed the assault and there had never been previous individual hostility between them.

The record is not clear how or when prison officials decided to alter the previously imposed segregation and prohibition on all potential contact between Southern Hispanic inmates and African American inmates. Defendant Fuizzotti claims he was following approved procedures for that day – though he does not recall the source he consulted to find out what was approved. In his declaration he states "I do not recall whether I checked a written plan of operations for the day, or verified it orally with my sergeant, but I do remember verifying the procedures to be used." He claims that after the incident he "checked again" to verify he used the proper procedure, though he does not indicate with whom or what he checked.

Defendant Gums was Officer Fuizzotti's superior officer at CSP-Solano on December 21, 2006. His declaration states he does not recall directing the escort, though he said it "was in accordance with the plan of operations for that day." There is no documentary evidence in the record of the "plan of operations for that day."

Defendant Sequira was the Facility captain for Facility 1 at all relevant times. After the lockdown, he gathered information to determine whether and when the institution could return to regular programming. He also served on the administrative segregation classification committees that determined the appropriate housing for inmates who had been removed from the general population as a result of the July 6, 2006 incident. Sequira met regularly with staff under his authority, and with executive staff, including the Warden, Defendant Sisto, to share information of any ongoing threats of violence. In Defendant Sequira's declaration to the court he does not affirmatively represent that he recalls (or has evidence of) making any verbal or written recommendation to alter the escort procedures. Rather, his declaration states that "[t]he recommendation that Southern Hispanic inmates be escorted from their cells after clothed body searches, without handcuffs, and in a ratio of

ORDER - 4

four or five inmates to one officer, *would have come from me. The final decision, however, belonged to Warden Sisto."*

Defendant Sisto had to approve all measures taken to modify programming. Defendant Sisto's declaration states that he made the decision that "it was safe and appropriate to allow one correctional officer to escort four Southern Hispanic inmates to the medical clinic without handcuffs..." The declaration, however, does not state *when* or in what context he made that decision.

Van Dyke filed this civil rights lawsuit claiming failure to protect under the Eighth Amendment. Specifically, he claims that Defendants were subjectively aware of the physical threat to Plaintiff poised by prison gangs, that they disregarded this risk and failed to take adequate measures to protect him from attack. He claims as a result of the attack he suffered trauma to his face, nose and mouth. The court directed service of the Complaint on Defendant Sisto, Sequira, Fuizzotti and Gums.

## II.  LEGAL STANDARD

Summary judgment is properly granted when no genuine and disputed issues of material fact remain and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Eisenberg v. Ins. Co. of N. Am.,* 815 F.2d 1285, 1288–89 (9th Cir.1987). The moving party bears the burden of showing that there is no material factual dispute. Therefore, the Court must regard as true the opposing party's evidence, if supported by affidavits or other evidentiary material. *Celotex*, 477 U.S. at 324; *Eisenberg*, 815 F.2d at 1289. The court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir.1991).

Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, may affect the outcome of the case. The substantive law

ORDER - 5

will identify which facts are material. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248, (1986). Where the moving party does not bear the burden of proof on an issue at trial, the moving party may discharge its burden of showing that no genuine issue of material fact remains by demonstrating that "there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. The burden then shifts to the opposing party to produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." *Bhan v. NME Hosps., Inc*., 929 F.2d 1404, 1409 (9th Cir. 1991), cert. denied, 502 U.S. 994 (1991). A verified complaint may be used as an opposing affidavit under Rule 56 of the Federal Rules of Civil Procedure, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence. *Schroeder v. McDonald*, 55 F.3d 454, 460 & nn. 10–11 (9th Cir.1995). A complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. *Celotex*, 477 U.S. at 323.

**III.    DISCUSSION**

   **A.    Deliberate Indifference**

Plaintiff alleges the Defendants were deliberately indifferent to his safety, resulting in his being assaulted and injured. The Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of prisoners. *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994). In particular, prison officials have an affirmative duty to protect inmates from violence at the hands of other inmates. *See id.* at 833. The failure of a prison official to protect inmates from attacks by other inmates or from dangerous conditions at the prison violates the Eighth Amendment only when two requirements are met: (1) the objective component—the deprivation alleged must be sufficiently serious, *see Farmer*, 511 U.S. at 834 (*citing Wilson v. Seiter*, 501 U.S. 294, 298 (1991); and (2) the subjective component—the prison official must possess a sufficiently culpable state of mind. *See id. (citing Wilson*, 501 U.S. at 297).

ORDER - 6

In determining whether a deprivation of a basic necessity is sufficiently serious to satisfy the objective component of an Eighth Amendment claim, a court must consider the circumstances, nature, and duration of the deprivation. *Id*. at 834 (*citing Wilson*, 501 U.S. at 298). With respect to the subjective component, the requisite state of mind depends on the nature of the claim. In prison-conditions cases, the necessary state of mind is one of "deliberate indifference." *See, e.g., Allen v. Sakai*, 48 F.3d 1082, 1087 (9th Cir.1994) (outdoor exercise); *Farmer*, 511 U.S. at 834 (inmate safety); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (inmate health); *Wilson*, 501 U.S. at 302–03 (general conditions of confinement).

A prison official cannot be held liable under the Eighth Amendment for failing to guarantee the safety of a prisoner unless the standard for criminal recklessness is met, i.e., the official knows of and disregards an excessive risk to inmate health or safety. *See Farmer*, 511 U.S. at 837. The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. *See id*. Deliberate indifference describes a state of mind more blameworthy than negligence. *See Farmer*, 511 U.S. at 835 (*citing Estelle*, 429 U.S. at 104). Neither negligence nor gross negligence will constitute deliberate indifference. *See Farmer*, 511 U.S. at 835–36 & n. 4; *see also Estelle*, 429 U.S. at 106 (establishing that deliberate indifference requires more than negligence).

It can not be disputed that Plaintiff, as an African American, belongs to a group of prisoners who have been frequently singled out for violent attacks at CSP-Solano. It is further undisputed that on December 21, 2006 date in question, officials were aware of a generalized risk of renewed hostilities and violence between Southern Hispanic and African American inmates, and specifically, the potential for retaliatory violence by African American inmates. These circumstances were likely to persist at CSP-Solano no matter what policies were in place. The attack in this case occurred after the prison had imposed a *five month* lockdown -- an extended "cool down period" as it is referred to by Defendants -- and

ORDER - 7

segregated Southern Hispanic inmates, in part, as increased incentive for better prison behavior.

Plaintiff believes this attack should have been prevented. He claims Defendant Fuizzotti acted with deliberate indifference in performing the escort without restraints and when he failed to follow established escort procedures by failing to notify the yard observer or tower officer to inform them of the pending escort. Yet, according to incident reports of the yard officer (ECF No. 56, Ex 17), the yard officer did notice the escort and responded to assist with the escort and prepare the pathway, as escort procedures dictated. Plaintiff further contends that Defendant Gums should have realized that Defendant Fuizzotti was not adequately experienced to conduct the escort on December 21, 2006. However, there is no evidence nor allegation that Defendant Fuizzotti's lack of experience played any role in his actions on December 21, 2006.

As for Defendants Sisto and Sequira, Plaintiff contends they were deliberately indifferent in their failure to do more, other than allow for the passage of time, to abate the threat of harm. Specifically, Plaintiff points out that after July 6, 2006 and until December 21, 2006 there had not been an attempt to broker a peace treaty between African American and Southern Hispanic inmates. Furthermore, Plaintiff contends the Program Status Reports signed by Sisto and Sequira after the lockdown should have included specific directives for strip searching Southern Hispanic inmates prior to escort, and for escorting such inmates with restraints and a one-to-one inmate-officer ratio. Had these requirements been in place, Plaintiff claims, the attack could have been prevented.

The court takes judicial notice of the fact that during lockdowns staff of the affected institution are required to prepare formal Program Status Reports which outline the management Plan of Operation. *See Noble v. Adams*--- F.3d ----, 2011 WL 3275871, *6 (9th Cir. 2011)(describing Program Status Reports). These status reports continue until normalcy is achieved and are designed to notify both staff and inmates of prevailing conditions. *Id*. Plaintiff has submitted as evidence the Program Status Reports covering the period from July

ORDER - 8

6, 2006 until September 17, 2007. Each of the five PSRs from July 6 to December 15, 2006 reflect that the lockdown was under constant review by officials. The December 15, 2006 PSR under the "Movement" section, indicates that movement of Southern Hispanic inmates shall be by escort. It does not reflect inmate movement had to be under restraint or with a one-to-one inmate to officer ratio.

With the volatile situation posed by prisons dominated by racial gangs, prison officials have the most difficult task of tailoring policies which correspond to the objectives of prison order and the other obligations the law imposes. Though permanent racial segregation, one-to-one inmate to officer ratios, and handcuffed escorts might seem like the best possible means to protect inmates from violent dangerous conditions at CSP-Solano, the Constitution prohibits segregation of inmates by race merely because of a generalized expectation of racial violence. *Johnson v. California*, 125 S. Ct. 1141, 160 L. Ed. 2d 949 (U.S. 2005). Prisons are required to narrowly tailor their policies to address *particularized circumstances*. As Defendants point out, the realities of prison management are that "they ultimately cannot know when inmates will attack each other until and unless inmates are given the opportunity to do so....At some point, prison officials have to take a calculated risk and allow inmates who had previously been hostile to mingle with each other..." ECF No. 57 at 4.

For good reason, courts are loath to second-guess these most difficult institutional decisions. As the Ninth Circuit has recently noted, it is not clearly established yet precisely how or when a prison facility must return to normal operations after a violent outbreak, thus courts defer to prison officials' judgment so long as that judgment does not manifest either deliberate indifference or an intent to inflict harm. *Noble v. Adams*, --- F.3d ----, 2011 WL 3275871 (9th Cir. 2011). Courts must accord prison officials whose expertise in prison administration far exceeds our own..." "wide ranging deference," *Norwood v. Vance*, 591 F.3d 1062, 1069-70 (9th Cir. 2010), and not "trespass [] against...warnings not to micro-manage prisons." *Noble*, 2011 WL 3275871, *8 (9th Cir. 2011).

ORDER - 9

With these admonitions in mind, the particular circumstances in this case are such that this court cannot conclude that after a five months of modified procedures and segregation, any of the Defendants acted with actionable Eighth Amendment subjective intent.  Although the actions of the Defendants permitting the movement of four unhandcuffed Southern Hispanic inmates through the vicinity of African American inmates after five months of segregation might be viewed as negligent, Plaintiff has not made out a record of *deliberate indifference* to Plaintiff's safety.  *Deliberate indifference* is a state of mind more blameworthy than negligence, and is not enough merely to show that an officer failed to act reasonably.   Moreover, the Defendants' state of mind must be reviewed from the Defendants perspective at the time in question, not with hindsight's perfect vision. *Jackson v. Everett*, 140 F.3d 1149, 1152 (8th Cir. 1998).

Plaintiff endured a major, unprovoked attack.  The court understands that from Plaintiff's point of view, the fact that the assault took place is sufficient to blame the prison officials for failing to prevent it.  However, the law cannot guarantee an assault-free prison environment.  There is no evidence Defendants knew of a strong likelihood that violence would occur during the escort on December 21, 2006.  The Eighth Amendment requires prison officials to take *reasonable* measures to guarantee the safety of the inmates and to protect them from harm at the hands of others.  Prison officials cannot be expected to eliminate the possibility of all dangers. Thus, the right to reasonable protection does not include protection from all random acts.

**B.     Qualified Immunity**

Defendants also claim qualified immunity.  The court has found no constitutional violation.  If the facts alleged here amounted to a constitutional violation, a finding of qualified immunity would be appropriate.

**IV.    CONCLUSION**

For the foregoing reasons, the court orders as follows:

ORDER - 10

The Defendants' Motion for Summary Judgment (ECF No. 51) is **GRANTED**. The District Court Executive is directed to enter Judgment of Dismissal of Plaintiff's Complaint (ECF No. 1) and the claims therein with prejudice and **CLOSE THE FILE**.

Dated August 19, 2011.

s/ Justin L. Quackenbush<br>
JUSTIN L. QUACKENBUSH<br>
SENIOR UNITED STATES DISTRICT JUDGE